**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| U SWIRL LLC,<br>a Delaware limited liability company,<br><br>      Plaintiff,<br><br>      v.<br><br>U-SWIRL INTERNATIONAL, INC.,<br>a Nevada corporation, and<br>ROCKY MOUNTAIN CHOCOLATE<br>FACTORY, INC., a Delaware corporation,<br><br>      Defendants. | C.A. No. _____ |

## COMPLAINT

Plaintiff, U Swirl LLC, by and through its undersigned counsel, hereby files its Complaint for damages and injunctive relief against Defendants, U-Swirl International, Inc. and Rocky Mountain Chocolate Factory, Inc., and in support thereof, states as follows:

### Parties, Jurisdiction and Venue

1.      Plaintiff, U Swirl LLC ("U Swirl"), is a Delaware limited liability company whose members reside in California and Missouri.

2.      Defendant, U-Swirl International Inc. ("USI"), is a Nevada corporation with its principal place of business located at 265 Turner Drive Durango, Colorado 81303.

3.      Defendant, Rocky Mountain Chocolate Factory, Inc. ("RMCF" and together with USI, "Defendants"), is a Delaware corporation with its principal place of business located at 265 Turner Drive Durango, Colorado 81303.

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (a)(2) because the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs, and attorneys' fees.

5.     Venue is proper in this Court pursuant to the forum selection clause agreed to by the parties in their written agreement.

**General Allegations**

**A.     Relationship Between the Parties and the Asset Purchase Agreement**

6.     U Swirl is the current owner and franchisor of a network of self-serve frozen yogurt franchise systems operating over fifty franchised locations throughout the United States under the following seven brands: U-Swirl Frozen Yogurt, Cherry Berry, Yogurtini, Fuzzy Peach, Yogli Mogli, Let's Yo, and Aspen Leaf Frozen Yogurt (the "U-Swirl Franchise System").

7.     U Swirl is managed by a team of executives with extensive experience in the franchise industry.

8.     USI is the former owner and franchisor of the U-Swirl Franchise System.

9.     RMCF is the parent company of USI and is the owner and franchisor of chocolate and confectionary stores operating under the brand "Rocky Mountain Chocolate Factory."

10.     In late 2022, U Swirl was presented with the opportunity to acquire the U-Swirl Franchise System, which executives from both RMCF and USI represented as an established and turnkey franchising operation.

11.     Specifically, Defendants represented to U Swirl that through the acquisition, U Swirl would receive all tools and assets needed to operate as a franchisor of the U Swirl Franchise System, including business plans, intellectual property, proprietary software, business records and databases, marketing tools, and established vendor and franchise relationships.

12.    Defendants further represented that USI had completed and would provide extensive data on each of the brands, including, *inter alia*, brand decks, brand development information, architectural drawings, color schematics, design plans, artwork, equipment lists and distributor and supplier directories.

13.    In essence, the acquisition of the U-Swirl Franchise System presented U Swirl with the opportunity to hit the ground running and focus its efforts on expanding an established franchise system, rather than spending the time and expenses necessary to develop a franchise system from the ground up.

14.    Notably, prior to closing of the transaction at the heart of this dispute, Defendants denied U Swirl the right to speak with any vendor of the U-Swirl Franchise System, and denied U Swirl's request to provide brand data information, purportedly due to RMCF's status as a publicly traded company.

15.    Although U Swirl was concerned about not receiving certain information prior to closing, Defendants repeatedly assured U Swirl that all items would be provided upon closing. USI also promised to provide certain post-closing services to ensure a seamless transition.

16.    Relying on Defendants' representations, U Swirl decided to move forward with the acquisition.

17.    To that end, on or about May 1, 2023, U Swirl as buyer, USI as the seller, and RMCF as the guarantor entered into an Asset Purchase Agreement ("APA"), whereby U Swirl acquired substantially all of USI's assets, including its rights as franchisor for over fifty franchised frozen yogurt stores (the "Subject Restaurants"), as well as all assets required or related to the operation of the U-Swirl Franchise System.

18.     At Closing, USI was required to provide U Swirl with, among other things, possession of the purchased assets and documents transferring right, title, and interest in the same. APA, ¶4.2.

19.     As set forth in Annex II of the APA, the purchased assets included, *inter alia*: (i) intangible property; (ii) all of USI's transferable contractual rights in agreements related to the U-Swirl Franchise System or the Subject Restaurants; (iii) all records of the business; (iv) and all other assets, properties and rights of USI relating to the Subject Restaurants or the U-Swirl Franchise System (other than the excluded assets as defined in Exhibit A of the APA). *See* APA, Annex II.[1]

20.     Moreover, in connection with the APA, USI made several representations and warranties and provided the Disclosure Schedules (the "Disclosure Schedules"), which were intended to provide U Swirl with a complete and accurate understanding of USI's existing contracts, relationships, and financial commitments.

21.     Specifically, pursuant to Section 5.9 of the APA, USI represented that it had completely and accurately disclosed all contracts (including any written or oral agreements, arrangements, or understandings) material to the U-Swirl Franchise System, including franchise agreements, third party supplier and vendor contracts, leases and any other agreements essential for the continued operation of the Business and the Restaurants. APA, ¶5.9.

22.     USI also represented that "[e]ach Material Contract is in full force and effect and is legal, valid, binding and enforceable against Seller and all other parties thereto in accordance with its terms." APA, ¶5.9.

---

[1] Intangible Property is defined in the APA to include in relevant part: trademarks, service marks, copyrights and copyrightable material, trade secrets, customer lists, business plans, computer programs and related algorithms, data and databases related to or used in connection with the U-Swirl Franchise System. APA, B-1 (s).

23.     Moreover, pursuant to the APA, USI and RMCF were required to refrain after closing from competing against the U-Swirl Franchise System for a period of four (4) years.

24.     Indeed, as reflected in Section 8.6 of the APA, USI and RMCF expressly agreed that they "shall not directly or indirectly, for, with or through any Person (and shall not permit any of their respective immediate family members to), engage in or assist others in engaging or attempting to engage in, or have an interest in, in any capacity, a frozen yogurt business similar to the Business" for a period of four (4) years from the effective date. APA, ¶8.6.

25.     In addition, simultaneous with the execution of the APA, USI and U Swirl entered into the Transition Services Agreement (the "TSA"), pursuant to which USI agreed to provide U Swirl with continued support, assistance and training, by performing certain services on a cost per hour basis for a term ending on the earlier of one-year or two hundred and twenty-five (225) hours.

26.     Specifically, USI agreed to perform the following services under the TSA: (i) operational support including providing training and assistance of practices and procedures, new store openings, and supply chain consultation; (ii) financial and accounting support assisting in the transfer of accounting duties, account reconciliations, POS polling and ACH pulls; (iii) IT support including transferring of primary domains, websites, gift card accounts, and other technical advice; (iv) marketing services including transferring of all marketing materials, and social media accounts; (v) franchise development advice and consultation including finding new locations, franchise referral consultants, and referring then current franchise leads.

27.     As reflected in Section 4.1 of the APA, the closing was set to take place concurrently with the execution of the APA, on May 1, 2023 (the "Closing"), during which USI and U Swirl would exchange their respective closing deliverables detailed in Sections 4.2 and 4.3 of the APA.

28.     In consideration of the transaction, U Swirl agreed to pay the substantial purchase price which was comprised of an initial cash payment that was due at closing (the "Closing Cash Payment"), with the balance of the purchase price being paid pursuant to the terms of a promissory note.

29.     U Swirl promptly performed all obligations owed by it under the APA. However, after the closing, U Swirl discovered that Defendants had not held up their end of the bargain.

30.     Indeed, upon taking over the U-Swirl Franchise System, U Swirl discovered that not only had USI failed to provide various essential assets, but USI had withheld critical information and actively misrepresented several material aspects of the U-Swirl Franchise System.

**B.     USI's Failure to Convey Essential Assets in Breach of the APA.**

31.     Despite its contractual obligations, USI has failed to deliver several purchased assets essential to the operation of the U-Swirl Franchise System.

32.     Indeed, on several occasions, USI representatives stated that USI maintained and would provide extensive data for each of the Brands, including brand development information, a brand deck, artwork, design plans, architectural drawing files, construction guidelines, color schematics, and a flow chart detailing the process from franchise agreement signing through opening.

33.     USI also promised to provide U Swirl with guideline requirements for accepting new franchisees, a complete and accurate supplier directory detailing which distributors supply specific products, and franchisee equipment lists and smallware's lists detailing the items required for new franchisees.

34.     However, USI failed to provide any of these items, all of which are essential to the operation of the U-Swirl Franchise System and U Swirl's ability to offer and sell new franchise locations.

35.     Similarly, USI failed to provide U Swirl with the graphics maker program ("Graphics Maker"), a proprietary software program that USI developed in connection with the U-Swirl Franchise System used to create customized signage and artwork across franchises.

36.     Likewise, USI maintained a database of historic franchisee performance, which allowed financial data from a franchisee's store to be pulled and recorded in a convenient manner for accounting and collecting purposes. Yet, this database was never turned over to U Swirl.

37.     USI's failure to provide these assets has caused and continues to cause U Swirl to incur substantial time, labor, and resources in operating the U-Swirl Franchise System.

38.     In addition, pursuant to the APA, USI was required to provide U Swirl all social and digital media accounts and passwords related to or used in connection with the U-Swirl Franchise System. APA, B-1 (s).

39.     However, instead of turning over the various social media accounts and passwords as required by the APA, USI added U Swirl representatives as "users" while retaining administrator access—and the ability to remove U Swirl's access at any time—to the same.

40.     Furthermore, pursuant to the APA, the purchased assets also included USI's rights to all contracts of the business as well as any other assets, properties, or rights of USI relating to the Subject Restaurants or the U-Swirl Franchise System, other than the expressly excluded assets. APA, Annex II (ii) and (ix).

41.    Notwithstanding same, USI failed to transfer the Credit Card Processing Fee Rebate account to U Swirl and continued to receive and retain credit card processing fee rebates that rightfully belong to U Swirl for over thirteen (13) months.

42.    While RMCF has updated the credit card processing account information, RMCF has not remitted the improperly collected rebates or provided U Swirl with an accounting demonstrating the amounts due under the same.

**C.    Defendants' Misrepresentations Regarding Franchisee and Vendor Relationships.**

43.    Post-Closing, U Swirl learned that USI had withheld critical information and actively misled U Swirl regarding various material aspects of the U-Swirl Franchise System.

44.    Specifically, as it relates to franchise agreements, USI provided U Swirl with copies of the purportedly valid franchise agreements for each of the Subject Restaurants, pursuant to which U Swirl assumed the right to receive royalty fees and marketing fees at the rates stated therein.

45.    However, contrary to the terms of the disclosed franchise agreements, U Swirl learned after closing that USI historically collected royalty and marketing fees at rates lower than those stated in the respective franchise agreements for at least seventeen of the Subject Restaurants.

46.    Indeed, while the terms of the disclosed franchise agreements required a 6% royalty fee and a 2% marketing fee, USI collected royalty fees at rates ranging from 2.5% to 5%, and marketing fees between 0% and 1%.

47.    This critical information was intentionally withheld by Defendants and not disclosed to U Swirl, nor did Defendants offer amendments, agreements, or any documents to explain these discrepancies.

48.     Similarly, several of the Subject Restaurants operate as "co-branded" locations, wherein U Swirl franchisees offer both frozen yogurt products as well as RMCF chocolate products (the "Co-Branded Locations").

49.     As U Swirl franchisees, U Swirl charges and collects royalty fees on products sold at the Co-Branded Locations pursuant to the terms of each respective franchise agreement. In turn, U Swirl is required to pay RMCF a royalty on any RMCF products sold at these Co-Branded Locations.

50.     However, post-Closing, RMCF changed how sales at these Co-Branded Locations were reported to U Swirl, preventing U Swirl from confirming the sales of RMCF chocolates compared to sales of other products that fall outside of the royalty obligation.

51.     Moreover, although U Swirl has since been able to access franchisee sales reports, U Swirl has no way of differentiating yogurt product sales from RMCF chocolate product sales, given that these reports are broken down by SKU number and Defendants have refused to provide any information identifying the products assigned to each SKU number.

52.     On various occasions, U Swirl has requested that RMCF provide a detailed invoice or sales report accounting for the amount purportedly due by U Swirl. However, RMCF has refused to provide this crucial information, or any possible solution.

53.     In addition, Defendants assured U Swirl on numerous instances that Co-Branded Locations could be seamlessly transferred without additional approval from RMCF, given the that Co-Branded Location operate as U Swirl franchisees.

54.     Notwithstanding these assurances, when a Co-Branded Location was recently transferred to a new franchisee, RMCF wrongfully claimed that some un-identified transfer process was not completed and improperly refused to sell products to the Co-Branded location.

55.     RMCF's misrepresentations and failure to abide by its obligations related to the Co-Branded Locations has caused and continues to cause U Swirl to expend substantial time and resources in attempting to resolve the various issues caused by RMCF's improper conduct.

56.     As it relates to vendor and supplier agreements, USI represented that a complete and accurate list of all vendor contracts was disclosed to U Swirl.

57.     However, while USI originally disclosed to U Swirl only three material contracts, U Swirl learned post-Closing that USI was a party to numerous other vendor contracts that were material to the U-Swirl Franchise System. USI never disclosed these additional contracts to U Swirl.

58.     For instance, during its operation of the U-Swirl Franchise System, USI had a vendor contract with Otis Spunkmeyer, whose cookies are sold in some of the Subject Restaurants, from which USI received reduced and/or wholesale pricing.

59.     Not only was the relationship with Otis Spunkmeyer never disclosed, but U Swirl subsequently learned that USI and/or RMCF intentionally removed U Swirl from that contract.

60.     Similarly, prior to Closing, U Swirl was advised that there were nine distributors serving the Subject Restaurants. Yet, U Swirl learned post-Closing that a total of sixteen distributors were responsible for distributing goods and supplies to the Subject Restaurants, and that USI failed to provide essential information about these key distributors, including average drop size per order and delivery frequency, details which are required for negotiations and operations.

61.     As a direct result of USI's incomplete or improper disclosures, U Swirl has been prevented from properly planning or managing such relationships, leading to confusion and strained relationships with distributors who provide key supplies.

62.     Each of these misrepresentations by USI and RMCF is not isolated, but rather part of a troubling pattern which has undermined U Swirl's ability to operate and grow the U-Swirl Franchise System, causing significant damage.

63.     Indeed, while USI repeatedly represented that the U-Swirl Franchise System could be operate with 20-40 hours per month, U Swirl is currently spending a minimum of 150 hours per week in order to operate the very same business that USI assured would be a turnkey transaction.

64.     Given USI's omissions, incomplete disclosures and blatant misrepresentations, U Swirl has faced increased operational costs, delays in expansion, and damages relationships with suppliers, vendors, and franchisees.

**D.     USI's Failure to Transfer the Gift Card Vendor Program Account.**

65.     During its operation of the U-Swirl Franchise System, USI maintained an account with a gift card vendor, which provided the terminals required to accept gift cards to each of the franchisees.

66.     Prior to Closing, U Swirl inquired about assuming the existing gift card program, and was advised by Defendants that it would be able to open a new account with the gift card program vendor, which would be compatible with the existing hardware.

67.     However, U Swirl was informed post-Closing by the gift card program vendor that gift card readers cannot be tied to multiple accounts, and if a new gift card account was assigned to U Swirl, each location accepting gift cards would be required to purchase new terminals at a cost of approximately $1,250.00 each.

68.     Given USI's failure to provide U Swirl with the gift card account, U Swirl has not received any of the funds for new gift cards purchased in any of the Subject Restaurants since it took over the U-Swirl Franchise System.

69.     When U Swirl brought this to Defendants' attention, RMCF representatives promised to transfer the asset and liability associated with the current gift card program to enable U Swirl and its franchisees to use the existing gift card readers.

70.     However, while USI collected over $3,000,000.00 from customer purchased gift cards, RMCF claims that U Swirl is due only $160,000.00.

**E.      U Swirl N-Go Kiosk Concept Misinformation and RMCF's Violation of the Non-Compete.**

71.     On or about April 10, 2023—prior to Closing—U Swirl representative, Nimesh Dahya specifically inquired about a U Swirl frozen yogurt kiosk concept called "U-Swirl N-Go" (the "Kisok Concept") after seeing reference to it on USI's then-current website.

72.     Mr. Dahya was advised by Greg Pope, then current RMCF executive, that the Kiosk Concept was merely a concept idea that had been shut down and discontinued.

73.     Despite such assurances, post-Closing, U Swirl learned that an undisclosed U-Swirl N-Go frozen yogurt kiosk using the U Swirl trademarks was operating in Denver International Airport within a RMCF franchised location (the "Airport Kiosk").

74.     Notably, Defendants were aware of the existence of the Airport Kiosk—indeed, USI had historically collected distributor rebates from products sold at the Airport Kiosk, and post-Closing, RMCF continued to collect royalty and other fees associated with the sale of U Swirl branded products from the Airport Kiosk.

75.     Notwithstanding Defendants' awareness of the Airport Kiosk's operations, and USI's express representation that all material contracts had been completely and accurately disclosed, the Airport Kiosk was not included as a Subject Restaurant, and U Swirl was not provided with any franchise agreement, licensing agreement, or other document by which USI granted the Airport Kiosk the right to use the U Swirl Trademarks.

76.     USI's failure to disclose the Airport Kiosk and its failure to remit royalty fees and other fees that rightfully belong to U Swirl is a material breach of the APA.

77.     Moreover, USI's failure to provide any assets related to the Kiosk Concept to U Swirl, in material breach of the APA.

78.     Specifically, and as discussed above, the purchased assets included any non-excluded assets, business records, intellectual and intangible property relating to the U-Swirl Franchise System, notwithstanding such obligations, USI has refused to provide U Swirl with any business plans, design plans, or other records related to the Kiosk Concept.

79.     In addition, RMCF's conduct in relation to the Airport Kiosk was in violation of ¶8.6 of the APA.

80.     Despite explicitly agreeing to refrain from directly or indirectly competing with U Swirl, post-Closing RMCF continued assisting the Airport Kiosk in selling or offering U Swirl branded products and continued to collect fees in blatant violation of Section 8.6 of the APA.

**F.     U Swirl Demands Defendants Comply with APA.**

81.     Upon taking over the U-Swirl Franchise, U Swirl informed Defendants of the issues caused by the misinformation provided by Defendants and demanded that USI provide the assets that it was rightfully entitled.

82.     In response, Defendants acknowledged their failure to comply with their obligations and promised U Swirl that each of the issues would be promptly corrected. However, in time, Defendants' assurances were revealed to be nothing more than a series of excuses and false post-closing promises.

83.     Indeed, although Defendants repeatedly assured U Swirl that they were working on resolving the issues, during the months following the execution of the APA, emerged a pattern of

RMCF directing U Swirl to explain the issues to different RMCF representatives who U Swirl would then be informed had left the company before any of the issues were resolved.

84.     As a result of Defendants' failure to comply with their obligations, on or about March 19, 2024, U Swirl sent Defendants a demand letter identifying unresolved issues and providing Defendants with the opportunity to comply with the terms of the APA.

85.     Thereafter, U Swirl was directed to Jeff Geygan, RMCF's interim CEO who assured U Swirl that Defendants would deliver the missing assets and comply with its obligations under the APA.

86.     Considering Mr. Geygan's representations and in an effort to remain in good standing under the Promissory Note, U Swirl proposed creating a mutually agreeable escrow account to hold payment until the outstanding issues were resolved, or alternatively a mutually agreed upon extension providing time for USI to address its unresolved obligations.

87.     Pursuant to the terms of the Promissory Note, payments would begin one year after its execution, on June 1, 2024 (the "Initial Loan Payment Date").

88.     In acknowledgement of its failure to abide by the APA, USI agreed to extend the Initial Loan Payment Date, and on May 30, 2024, USI and U Swirl entered into a Loan Payment Extension Agreement extending the initial loan due date by seven days, on or before June 8, 2024 (the "May 2024 Extension").

89.      Pursuant to the terms of the May 2024 Extension, the parties agreed to work collaboratively and in good faith resolve the outstanding issues during this period, and further acknowledged and agreed that further extensions may become necessary.

90.     On June 6, 2024, U Swirl and USI entered into another Loan Payment Extension Agreement, further extending the initial loan payment due by an additional fourteen-day period, on or before June 22, 2024 (the "June 2024 Extension").

91.     However, on June 21, 2024, RMCF advised U Swirl that it would not provide further extensions, and on Saturday, June 22, 2024, sent a notice of default under the Promissory Note, claiming that U Swirl was in default for failing to make the required payment on June 1, 2024.

92.     Notably, RMCF's decision prevented U Swirl from making payment *prior* to the June 22, 2024 extended deadline.

93.     In efforts to remain in good standing, and to avoid additional fees and interests, U Swirl promptly made payment on the following Monday morning.

94.     Despite taking this position, USI and RMCF executives continued to assure U Swirl that the outstanding issues and would be completed within weeks. Indeed, in an e-mail sent by Mr. Geygan on July 13, 2024, RMCF promised that all outstanding items would be completed on or before July 22, 2024.

95.     Ultimately however, U Swirl's issues remained unresolved, and U Swirl has been compelled to initiate the instant litigation based on the significant damages caused by Defendants' conduct.

## CAUSES OF ACTION

### Count I- Breach of Asset and Purchase Agreement
### (U Swirl against USI)

96.     U Swirl realleges and incorporates the allegations set forth in paragraphs 1 through 95, *supra*, as if fully set forth herein.

97.     The APA is a valid and binding contract between U Swirl and USI.

98.    U Swirl fully complied with the terms of the APA and USI accepted and retained the proceeds and benefits of the APA.

99.    As fully set forth in Paragraphs 6 – 70 and 81-95, *supra*, USI materially breached the express terms of the APA.

100.    As a direct and proximate result of USI's material breaches of the APA, U Swirl has suffered and continues to suffer substantial damages, including, *inter alia*, operational disruptions, increased expenses, and loss of business opportunities.

**WHEREFORE**, Plaintiff, U Swirl LLC respectfully requests that this Honorable Court enter a judgment against Defendant, U-Swirl International, Inc., for actual, compensatory, and consequential damages in an amount to be determined at trial, and such other relief as this Honorable Court deem just and proper.

## Count II- Breach of Asset and Purchase Agreement
## (U Swirl against RMCF)

101.    U Swirl realleges and incorporates the allegations set forth in paragraphs 1 through 95, *supra*, as if fully set forth herein.

102.    The APA is a valid and binding contract between U Swirl and RMCF.

103.    U Swirl fully complied with the terms of the APA and RMCF accepted and retained the proceeds and benefits of the APA.

104.    As fully set forth in Paragraphs 6 – 70 and 81 - 95, *supra*, RMCF materially breached the express terms of the APA.

105.    As a direct and proximate result of RMCF's material breaches of the APA, U Swirl has suffered and continues to suffer substantial damages.

**WHEREFORE**, Plaintiff, U Swirl LLC respectfully requests that this Honorable Court enter a judgment against Defendant, Rocky Mountain Chocolate Factory, Inc., for actual,

compensatory, and consequential damages in an amount to be determined at trial, reasonable attorneys' fees, costs and interest, and such other relief as this Honorable Court deem just and proper.

### Count III- Breach of the Implied Covenant of Good Faith and Fair Dealing (U Swirl against Defendants)

106.    U Swirl realleges and incorporates the allegations set forth in paragraphs 1 through 95, *supra*, as if fully set forth herein.

107.    The APA and the relationship between the parties gives rise to a mutually implied covenant of good faith and fair dealing. Defendants had a duty to act in good faith and to fairly deal with U Swirl in carrying out the terms and provisions of the APA and were prohibited from engaging in arbitrary or unreasonable conduct that had the effect of preventing U Swirl from receiving the fruits of the APA.

108.    Defendants breached the express and implied terms of the APA by acting arbitrarily, unreasonably and inconsistent with the reasonable expectations of the parties and by failing to exercise good faith in carrying out the terms of the APA.

109.    As a direct, proximate and foreseeable result of Defendants material breaches of their implied duty of good faith and fair dealing, U Swirl has suffered and continues to suffer substantial damages.

**WHEREFORE**, Plaintiff, U Swirl LLC respectfully requests that this Honorable Court enter a judgment against Defendants, U-Swirl International, Inc., and Rocky Mountain Chocolate Factory, Inc., for compensatory damages in an amount to be determined at trial, reasonable attorneys' fees, costs and interest, and such other relief as this Honorable Court deem just and proper.

**Count IV- Breach of Non-Compete**
**(U Swirl against RMCF)**

110.    U Swirl realleges and incorporates the allegations set forth in paragraphs 1 through

95, *supra*, as if fully set forth herein.

111.    As fully set forth in Paragraphs 6-30 and 71-80, *supra*, pursuant to Section 8.6 of

the APA, RMCF was prohibited from "directly or indirectly, for, with or through any Person (and

shall not permit any of their respective immediate family members to), engag[ing] in or assist[ing]

others in engaging or attempting to engage in, or have an interest in, in any capacity, a frozen

yogurt business similar to the Business" for a period of four (4) years from the effective date of

the APA.

112.    The terms of the non-compete contained in the APA is supported by legitimate

business interests.

113.    The non-compete provision is reasonable in duration and scope.

114.    RMCF breached the non-compete provision by continuing to operate or assist in

the operation of the "U-Swirl N-Go" kiosk at Denver International Airport, selling U-Swirl-

branded products in competition with U Swirl.

115.    As a direct, proximate and foreseeable result of RMCF's violation of the non-

compete, U Swirl has suffered substantial damages.

**WHEREFORE**, Plaintiff, U Swirl LLC respectfully requests that this Honorable Court

enter a judgment against Defendant, Rocky Mountain Chocolate Factory, Inc., for compensatory

damages in an amount to be determined at trial and such other relief as this Honorable Court deem

just and proper.

## Count V- Fraudulent Inducement
### (U Swirl against Defendants)

116.    U Swirl realleges and incorporates the allegations set forth in paragraphs 1 through 95, *supra*, as if fully set forth herein.

117.    As fully set forth in Paragraphs 6-30, 43-64, and 71-80, *supra*, Defendants, through their representatives made numerous false representations of material and existing facts to U Swirl.

118.    Defendants made such false representations knowingly and intentionally and such representations were intended to induce U Swirl into entering into the APA.

119.    Defendants intended for U Swirl to rely on the misrepresentations to its detriment.

120.    U Swirl reasonably and justifiably relied on Defendants' misrepresentations to its detriment. U Swirl would not have entered into the APA but for the misrepresentations of material facts by Defendants.

121.    As a direct, proximate and foreseeable result of the fraudulent conduct by Defendants, U Swirl has suffered and continues to suffer substantial damages.

**WHEREFORE**, Plaintiff, U Swirl LLC respectfully requests that this Honorable Court enter a judgment against Defendants, U-Swirl International, Inc., and Rocky Mountain Chocolate Factory, Inc., for compensatory damages in an amount to be determined at trial and such other relief as this Honorable Court deem just and proper.

## Count VI- Negligent Misrepresentation
### (U Swirl against Defendants)

122.    U Swirl realleges and incorporates the allegations set forth in paragraphs 1 through 95, *supra*, as if fully set forth herein.

123.    As fully set forth in Paragraphs 6-30, 43-64, and 71-80, *supra*, Defendants, through their representatives negligently made numerous representations of material facts, without knowledge of their truth or falsity, that were intended to induce U Swirl to enter into the APA.

124.    Had it not been for the negligent misrepresentations of existing material fact made by Defendants, U Swirl would not have entered into the APA.

125.    As a direct, proximate and foreseeable result of the wrongful and negligent conduct by Defendants, U Swirl has suffered and continues to suffer substantial damages.

**WHEREFORE**, Plaintiff, U Swirl LLC respectfully requests that this Honorable Court enter a judgment against Defendants, U-Swirl International, Inc., and Rocky Mountain Chocolate Factory, Inc., for compensatory damages in an amount to be determined at trial, reasonable attorneys' fees, costs and interest, and such other relief as this Honorable Court deem just and proper.

Dated: November 12, 2024                    Respectfully submitted,

                                            **THE ROSNER LAW GROUP LLC**

                                            */s/ Zhao Liu*
                                            Frederick B. Rosner (DE 3995)
                                            Zhao (Ruby) Liu (DE 6436)
                                            824 N. Market St, Ste 810
                                            Wilmington, Delaware 19801
                                            Phone: (302) 777-1111
                                            Email: rosner@teamrosner.com
                                            Email: liu@teamrosner.com

                                            -and-

                                            **ZARCO EINHORN SALKOWSKI, P.A.**

                                            Robert Zarco, Esq. (*pro hac vice* forthcoming)
                                            Robert F. Salkowski, Esq. (*pro hac vice*
                                            forthcoming)

Victoria Diaz, Esq. (*pro hac vice* forthcoming)
One Biscayne Tower
2 S. Biscayne Blvd., 34th Floor
Miami, Florida 33131
Phone: (305) 374-5418
E-mail: rzarco@zarcolaw.com
E-mail: rsalkowski@zarcolaw.com
E-mail: vdiaz@zarcolaw.com
E-mail: acoro@zarcolaw.com

*Counsel for Plaintiff U Swirl LLC*